**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CHECKPOINT SYSTEMS, INC., | : | **Case No. 5:11-CV-01199** |
| **Plaintiff,** | : | **(Judge Sara Lioi)** |
| v. | : | |
| HANGZHOU CENTURY CO., LTD d/b/a CENTURY PLASTIC & ELECTRONIC CO., LTD., et al., | : | **CHECKPOINT SYSTEMS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |
| **Defendants.** | : | |

Pursuant to Rule 4.4 of the Local Patent Rules, the Court's Order dated March 30, 2012

adopting the parties' proposed Revised Case Management Schedule and the Court's Order dated

September 21, 2012, Plaintiff Checkpoint Systems, Inc. ("Checkpoint") submits its Opening

Claim Construction Brief in support of its proposed constructions of each term identified by the

parties for claim construction.  For the convenience of the Court, Checkpoint has attached  charts

of the proposed final constructions of each term identified by the parties.

# I.    THE INVENTIONS

### A.    The '966 Patent.

United States Patent No. 7,251,966, Cable Wrap Security Device (the "'966 Patent") (Ex.

1)[1] discloses a security device which typically includes a plurality of wires or cables which

encircle and lock all six sides of a box, package, book or other similar structure.  The '966 Patent

includes 42 claims, eight of which are independent claims.  Checkpoint accuses Defendants

Hangzhou Century Co., Ltd. d/b/a Century Plastic & Electronic Co., Ltd. ("Century") and

Defendant Universal Surveillance Corporation d/b/a Universal Surveillance Systems ("USS") of

---

[1] All exhibit references are to Checkpoint Systems, Inc.'s Opening Claim Construction Submissions

infringing Claims 1, 20, 21, 38, 39, and 42 of the '966 Patent. Claims 1, 38, and 42 are independent claims.

      B.     <u>The '086 Patent.</u>

United States Patent No. 7,481,086 Cable Wrap Security Device (the "'086 Patent") (Ex. 9) discloses a security device which typically includes a plurality of wires or cables which encircle and lock all six sides of a box, package, book or other similar structure. The '086 Patent has 20 claims, three of which are independent claims. Checkpoint accuses Century and USS of infringing Claims 1, 2, 3, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, and 18 of the '086 Patent. Claims 1 and 9 are independent claims.

      C.     <u>The '495 Patent and the '310 Patent.</u>

United States Patent No. 7,342,495, Integrated Theft Deterrent Device (the "'495 Patent") (Ex. 17) and United States Patent No. 7,969,310, Integrated Theft Deterrent Device (the "'310 Patent") (Ex. 18) disclose an integrated theft deterrent device having a tag body, a lanyard permanently attached to and emanating from the tag body, and a pin permanently attached to the lanyard. The '495 Patent also discloses a method of manufacturing the integrated theft deterrent device. USS accuses Checkpoint of infringing Claims 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18 of the '495 Patent and Claims 1, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, and 17 of the '310 Patent.

## II.    LEGAL STANDARD FOR CLAIM CONSTRUCTION

Claim construction is solely a question of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 383-391 (1996). "Words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of

ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips* at 1313.  "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.*

A person of ordinary skill in the art reads and understands the claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*  As the Federal Circuit explained in *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (1998):

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.  Such person is deemed to read the words in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.  The inventor's words that are used to describe the invention – the inventor's lexicography – must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology.  Thus, the court starts the decision-making process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.  While such terms might appear in a claim, the Court recognized that more often "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art.  Because the meaning of a claim term as understood by persons of skill in the art are often not immediately apparent, and because patentees frequently use terms idiosyncratically," the Court encouraged the construing courts to look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* quoting *Innova/Pure Water, Inc.*

*v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Phillips* at 1314.

III.  **CHECKPOINT'S CLAIM CONSTRUCTION AND RESPONSE TO DEFENDANTS' CONSTRUCTION**

A.  The '966 Patent

1.  *first structure*

Claims 1, 38, and 42 of the '966 Patent disclose a security device comprising in part "... a first structure ..."  (Col. 17:32; Col. 22:43, Col. 24:8) and "an internal spool which is rotatable relative to the first structure ...". (Col. 17:33; Col. 22:44-45; Col. 24:9-10)

a.  The claims

"The appropriate starting point ... is always with the language of the asserted claim itself."  *Flexsys America, LP v. Kumho Tire, U.S.A., Inc.* 695 F.Supp. 2d 609, 613 (N.D. Ohio 2010).  Here, claim construction starts with independent Claims 1, 38, and 42.  Claims 1 and 38 require in part: "first and second engaging members mounted respectively on the first structure and the spool so that the second engaging member is rotatable with the spool ...".  (Col. 17:38-40; 22:49-51).  Claim 42 requires in part: "... a first engaging member mounted on the first structure; a second engaging member mounted on the spool, rotatable therewith…" (Col. 24:14-16).

In conjunction with the '966 figures, one of ordinary skill in the art would understand that the "first structure" must be the structure in which the internal spool is disposed because the "first structure" is, as claimed, the structure on which the first engaging member is mounted.  It can be seen from, e.g., Figs. 34-35 that teeth 352 of housing 226 are mounted on the "first

structure," that teeth 406 are mounted on and rotatable with spool 320, that teeth 352 engage teeth 406 to prevent the claimed rotation and that spool 320 is disposed in the "first structure".

Various dependent claims of the '966 Patent also support Checkpoint's proposed construction of "first structure". For example, Claim 4 recites in part that "the first structure includes ... a housing which defines an interior chamber in which the spool is disposed." (Col. 18:13-14). Claim 18 recites in part that "the first structure includes a housing comprising a bottom wall and sidewall which extends upwardly from the bottom wall to define a housing cavity in which the spool is disposed." (Col. 19:23-26).

### b. The specification

The specification indicates that bottom wall 228 of housing 226 "includes a first engaging member in the form of an upwardly projecting annular wall 350 having a plurality of one-way locking gear teeth 352 ...". (Col. 12:33-37). Likewise, similar references are relevant: Col. 13:34-35 mentions a second engaging member in the form of a gear disc 386; Col. 14:66-15:4 that teeth 406 of gear disc 386 engage teeth 352 of housing 226 to prevent spool 320 from rotating in the cable-loosening direction; and Col. 12:1-2 that spool 320 is disposed in cavity 231 of housing 226.

### c. The prosecution history

In the first paragraph of the first Office Action, the Examiner stated, "The language in the claims does not commensurate with the language present in the specification, and thus, the Examiner has broadly construed the claims in terms of the disclosure of the specification." (June 5, 2006 Office Action, Page 2). (Ex. 2). The Examiner effectively recognized at the outset that "first structure" was not explicitly described in the specification, yet did not reject the claims as being indefinite and neither objected to nor required any change to this language.

The Examiner's specific understanding is apparent, for example, at page 2 of the June 5, 2006 Office Action (Ex. 2), where the Examiner identifies in U.S. Patent No. 5,722,266 (Ex. 3) a first structure 50 (Figs. 6, 7, 10-13), which is a structure in which an internal spool 100 (Fig. 10) is disposed.  The same understanding is supported at page 2 of the January 25, 2007 Office Action (Ex. 4), which indicates that U.S. Patent No. 5,156,028 (Ex. 5) discloses a first structure 10 (Figs. 1–4) in which an internal spool 21 (Figs. 2-4) is disposed.

> d.      Construction of "first structure"

Given the Examiner's allowance and understanding of the structure of the security device, "first structure" is "a structure in which the internal spool is disposed."

> e.      Defendants' construction

Defendants argue that the term "first structure" is indefinite.  "Only when a claim remains insolubly ambiguous without a discernible meaning after all reasonable attempts at construction must a court declare it indefinite."  *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1366 (Fed. Cir. 2004).  "Accordingly, a claim term that is not used or defined in the specification is not indefinite if the meaning of the claim term is discernible."  *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004).  Here, "first structure" is discernible and, therefore, not indefinite.

> **2.      *unlocking mechanism***

Claims 1, 38, and 42 of the '966 Patent disclose a security device comprising in part "an unlocking mechanism for moving the one of the first and second engaging members from the locked to the unlocked position." (Col. 17:51-53; Col. 22:62-64; Col. 24:25-28).

> a.      Construction of "unlocking mechanism"

"Unlocking mechanism" should be given its ordinary and customary meaning.

> b.  Defendants' construction

Defendants contend that "unlocking mechanism" is a means-plus-function limitation subject to 35 U.S.C. §112(6), and list multiple components as being the "corresponding structure." However, neither the claims nor the specification support such construction. "The failure to use the word 'means' in a claim element created a rebuttable presumption that 35 U.S.C. §112, paragraph 6 did not apply." *Watts v. XL Systems, Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000). Here, the term "means" was not used in any claims of the '966 Patent. Further, neither Applicants nor the Examiner in any way invoked such a limitation throughout prosecution of the '966 Patent. If a "means for" limitation or other narrower scope of "unlocking mechanism" had been intended, claims would have been drafted to that effect. Furthermore, the Examiner did not invoke or imply such a limitation. Therefore, the presumption applies.

The Examiner's rejections recorded in the prosecution history clearly indicate that the Examiner construed the term "unlocking mechanism" broadly. For example, at page 3 of the June 5, 2006 Office Action, the Examiner identifies in U.S. Patent No. 5,722,266 an unlocking mechanism 115 (Fig. 14); and at page 3 of the January 25, 2007 Office Action, the Examiner identifies in U.S. Patent No. 5,156,028 an unlocking mechanism 30 (Fig. 2), which is very different from the unlocking mechanism of the '266 Patent.

"The claims must be read in view of the specification, but limitations from the specification are not to be read into the claims." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). "Where claims use different terms, those differences are presumed to reflect a difference in the scope of the claims." *Forest Laboratories, Inc. v. Abbott Laboratories*, 239 F.3d 1305, 1310 (Fed. Cir. 2001). "The presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir 2004).

Defendants assert that the corresponding structure associated with "unlocking mechanism" includes "at least a rotatable base 203 with an opening 232 for receiving key insertion; a key member 205 with a key end 207 including a hollow cylindrical projection 209 and a cross-shaped projection 211; keying formation 234 complementary to key end 207; a locking disc 236; a gear disc 286; projections 356; slot sections 376; and seating ledges 360." (The correct numeral for the gear disc is 386.)  While none of these terms appears in the asserted claims, several of them or equivalents do appear in non-asserted claims.  For example, "seating ledge(s)" is found in Claims 2, 4 and 6; "projections" in Claims 4-6; "central through hole" (which may represent "opening 232") in Claim 5; "holes" (which may represent "slot sections 376") in Claim 6; "gear disc" in Claim 25; and "locking disc" in Claims 25 and 40.  Claims 2, 4-6 and 25 depend directly or indirectly from Claim 1 and Claim 40 depends from independent Claim 38.  Defendants are thus attempting to read various claim elements from dependent Claims 2, 4-6, 25 and 40 into Claims 1 and 38 (and effectively into Claim 42), thereby making these dependent claims at least partially superfluous and redundant.

Defendants are also attempting to read the "key member" of non-asserted independent Claim 36 into Claims 1, 38 and 42.  Claim 36 illustrates that patentee knew how to restrict claim language in a manner different than that of Claims 1, 38 and 42 such that "unlocking mechanism" included "a key member."  Dependent Claims 2, 4-6, 25 and 40 illustrate the same. Thus, none of these or similar limitations should be read into the "unlocking mechanism" of Claims 1, 38 and 42.

Defendants' proposed construction, "A bottom wall with a central opening, through which the axis passes, for receiving a key end," presents similar problems.  Defendants again attempt to improperly read claim elements from Claims 4 and 5 into Claims 1, 38 and 42 -- for example, Claim 5 includes, "the bottom wall defines a central through hole...through which the

axis passes." Defendants also attempt to read into Claims 1, 38 and 42 "a key end", which is similar to or part of "a key member" of independent Claim 36, as evidenced by Defendants' means-plus-function "corresponding structure" list including a key member 205 with a key end 207.

### 3. *a force applied via the unlocking mechanism moves one of the first and second engaging members axially*

Claim 1 of the '966 Patent discloses a security device comprising in part "... one of the first and second engaging members is spring biased to the locked position; wherein a force applied via the unlocking mechanism moves the one of the first and second engaging members axially to overcome the spring bias ...". (Col. 17:54-58).

#### a. *Construction of "a force applied via the unlocking mechanism moves one of the first and second engaging members axially"*

"A force applied via the unlocking mechanism moves one of the first and second engaging members axially" should be given its ordinary and customary meaning.

#### b. *Defendant's construction*

"Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim* at 906. Defendants propose that this term should be construed to mean "a force applied by an external key moves one of the first and second engaging members axially in the direction of movement of the key end." Defendants are attempting to improperly read language from the specification into Claim 1 and in particular based on the single embodiment shown (Figs. 17-46) to which the claims apply. With respect to the claim term at issue, patentee in no way "demonstrated a clear intention to limit the claim using words or expressions of manifest exclusion or restriction."

Defendants' quotation of passages from the prosecution history is a blatant effort to support this improper practice by implying that one of the many distinctions noted in Amendment A (June 30, 2006) (Ex. 6) should be read into the claim. However, none of the limitations in any of the dependent claims presented in Amendment A were necessary to define over the cited U.S. Patent No. 5,722,266 – this was achieved simply by the axial movement of one of the engaging members, which was already present in claim 1. See patentee's argument at page 12 of Amendment A and the Examiner's withdrawal of the rejection in light of this argument at page 7 of the September 22, 2006 Office Action (Ex. 7).

### 4.      *ratchet teeth arranged in an annular fashion along a common circle*

Claim 38 of the '966 Patent discloses a security device comprising  in part "... the first engaging member includes a series of one-way ratchet teeth arranged in an annular fashion along a common circle ...". (Col. 22:65-67). Claim 42 of the '966 Patent discloses a security device comprising in part "…the first engaging member comprises a series of one-way ratchet teeth which are arranged in an annular fashion along a common circle …". (Col. 24:28-30).

#### a.      *Construction of "ratchet teeth arranged in an annular fashion along a common circle"*

"Ratchet teeth arranged in an annular fashion along a common circle" should be given its ordinary and customary meaning.

#### b.      *Defendant's construction*

Defendants propose that "ratchet teeth arranged in an annular fashion along a common circle" should be construed to mean "ratchet teeth extending radially inward from an annular wall relative to the axis." However, Defendants' proposal requires reading narrowing limitations from the specification into the claim. "[I]t is improper to read a limitation from the specification

into the claims." *Wayne-Dalton Corp. v. Amarr*, 2007 U.S. Dis. LEXIS 65382 (N.D. Ohio 2007) (internal quotation omitted).

Under the doctrine of differentiation, the meaning of the term at issue should be understood as different from "ratchet teeth extending radially inward from an annular wall relative to the axis," given that similar language is used in non-asserted claims 30, 33, 34 and 41. If Applicant had intended for the term at issue to be construed as suggested by Defendants, Claims 38 and 42 would have been drafted to that effect.

Furthermore, the prosecution history contradicts Defendants' proposed construction. During prosecution, Claim 33 (which issued as Claim 38) was amended to add "along a common circle" (page 12 of Amendment B mailed October 23, 2006) (Ex. 8) in response to a rejection as being anticipated by U.S. Patent No. 5,156,028 granted to Jiang (page 15 of Amendment B). Page 19 of Amendment B presented the following argument to overcome the rejection:

> Applicant respectfully disagrees with the Examiner regarding claim 33, which has been amended to incorporate the limitations of claim 1 and to clarify that the series of one-way ratchet teeth are arranged in an annular fashion <u>along a common circle</u>. Claim 33 further requires that the spool is rotatable about the axis relative to the ratchet teeth. In rejecting claim 33, the Examiner indicated that Jiang teaches a first engaging member including a series of one-way ratchet teeth 281 arranged in an annular fashion. Applicant submits however that the element 281 is but a single tooth in contrast to the requirement of a series of teeth which are arranged in an annular fashion. **Thus, for example, Jiang teaches a series of teeth 214 arranged in an annular fashion. Nonetheless, the amendment to claim 33 requiring that the teeth are arranged in an annular fashion along a common circle make it clear that element 281 cannot meet this requirement of the claim. Only teeth 214 of Jiang can meet this requirement** and obviously spool 21 of Jiang cannot rotate about the axis relative to teeth 214 since teeth 214 are a part of spool 21. (*emphasis added.*)

The prosecution history thus makes it clear that the claim term includes the configuration of Jiang ratchet teeth 214 (Figs. 2-3), which extend radially outward from an annular wall relative to the axis about which the spool rotates, in direct opposition to Defendants' proposed claim

11

construction of "ratchet teeth extending radially inward from an annular wall relative to the axis."

In the last five lines of page 6 of the January 25, 2007 Office Action, the Examiner's reasons for allowable subject matter refers to both "teeth which are rigidly connected to and extend radially inwardly therefrom toward the axis" and "ratchet teeth arranged in an annular fashion along a common circle." Thus, the Examiner's listing of these phrases separately indicates a different understanding of these phrases.

B.    The '086 Patent

1.    *first and second plurality of ratchet teeth extending about a common axis*

Claim 1 of the '086 Patent discloses a security device comprising in part "... a ratchet mechanism connected to the spool including a movable member operatively connected to the spool and having a second plurality of ratchet teeth for releasable engagement with the first plurality of ratchet teeth to prevent the spool from rotating in the cable-loosening direction, said first and second plurality of ratchet teeth extending about a common axis ...". (Col. 8:17-23).

a.    *The specification and prosecution history*

Checkpoint's proposed construction is supported by the specification of the '086 Patent at Col. 5:50-67, which indicates that gear disc 75 having teeth 76 is rotatable with spool 40. In addition, Checkpoint's construction is also supported in the prosecution history by the Examiner's understanding at page 5 of the March 18, 2008 Office Action (Ex. 10), in which the Examiner's reasons for allowable subject matter included the phrase "the ratchet mechanism and the spool being rotatable about a common axis." The Examiner understood that "extending" in the present context means "rotatable."

The difference in the phrase at issue and the phrase used by the Examiner is even more understandable when viewed in light of the fact that Claim 9 uses the somewhat similar phrase "said first member and the spool extending about a common axis" (in which Checkpoint likewise asserts that "extending" means "rotatable").  More particularly, the Examiner used a more general statement by which it would be understood by one of ordinary skill in the art that "extending" means "rotatable" in the phrases at issue in Claims 1 and 9.

>            b.      *Construction of "first and second plurality of ratchet teeth*
>                    *extending about a common axis"*

"First and second plurality of ratchet teeth extending about a common axis" should be construed as "first and second plurality of ratchet teeth rotatable about a common axis."

>            c.      *Defendant's construction*

By proposing that the first plurality of ratchet teeth extend radially inward and the second plurality of ratchet teeth extend radially outward about a common axis, Defendants are improperly attempting to read the claim term at issue based only on the single embodiment disclosed although patentee in no way "demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."

>     **2.      *said first member and the spool extending about a common axis***

Claim 9 of the '086 Patent discloses a security device comprising in part "... a ratchet mechanism connected to the spool, said ratchet mechanism having a handle mounted on the top wall portion of the housing for manual rotation of the top wall portion and spool without the need of a separate tool for tightening the cable around the object, said ratchet mechanism further including a movable first member having a first plurality of ratchet teeth for latching the spool in a fixed position relative to the housing to maintain the cable tightened around the object, with said first member and the spool extending about a common axis." (Col. 9:1-10).

### a. The specification

Checkpoint incorporates the arguments with respect to this claim term as discussed above with respect to the claim term "first and second plurality of ratchet teeth extending about a common axis" other than the specific difference between these two phrases.  In other words, Checkpoint asserts that "extending" in the context of the present term means "rotatable."

### b. Construction of "said first member and the spool extending about a common axis"

"Said first member and the spool extending about a common axis" should be construed as "said first member and the spool rotatable about a common axis."

### c. Defendants' construction

Defendants' proposed construction that the first member and spool extend radially outward about a common axis improperly attempts to restrict the claim term based only on the single embodiment disclosed although patentee in no way "demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."

### 3. **camming mechanism**

Claim 1 of the '086 Patent discloses a security device comprising in part "... a camming mechanism for moving the first and second plurality of ratchet teeth out of engagement ...". (Col. 8:24-25).  Claim 11 of the '086 Patent discloses: "The security device defined in claim 10 including a camming mechanism for moving the first and second plurality of ratchet teeth out of engagement to place the spool in the cable-loosening direction."  (Col. 9:17-20).

### a. Prior art

Checkpoint's proposed construction is established by several patents which are prior art to the '086 Patent.  For example, U.S. Patent No. 4,047,410 (Ex. 11) discloses a linear cam at Col. 7:33-37 and Figs. 7, 8 and 10 in which  cams or inclined edges 158 slidably engage cam follower surfaces 136 to cause movement of gate 132. U.S. Patent No. 3,933,240 (Ex. 12)

14

discloses a camming mechanism at Col. 4:6-8 and Fig. 10 in which  camming portions 42a and 42b slidably engage legs 40a and 40b of spring 34 to cause movement of legs 40a and 40b.  U.S. Patent No. 4,834,238 (Ex. 13) discloses a camming mechanism at Col. 8:33-37 and Fig. 21 in which camming surfaces 37 of wedge 36 slidably engage cam follower surfaces of tabs 46 to cause movement of tabs 46.  U.S. Patent No. 6,604,643 (Ex. 14) discloses a first camming mechanism at Col. 5:27-33 and Figs. 6-7 in which camming surfaces 46 slidably engage outer cam follower surfaces 42 of fingers 26 to cause movement of fingers 26.  The '643 Patent also discloses a second camming mechanism at Col. 6:4-10 and Figs. 8-9 in which cams 74 slidably engage cam follower surfaces 64 to cause movement of arms 60.

        *b.*       *Technical definitions*

"Because technical dictionaries endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Phillips*, 415 F.3d at 1318.  "[T]he court may appropriately consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Flexsys America*, 695 F.Supp. 2d at 614.

*The Handbook of Mechanical Engineering Terms* (2nd Ed. 2009) (Ex. 15) can assist the Court in determining the meaning of particular terminology in the state of the art for the '086 Patent. *The Handbook* defines a cam as a "reciprocating, oscillating or rotating body which imparts reciprocating or oscillating motion to a second body, called the follower with which it is in contact." *Id.* pp. 2 and 147.

        *c.*       *Construction of "camming mechanism"*

"Camming mechanism" is "a mechanical mechanism having a cam and a cam follower such that the cam slidably engages the cam follower during the movement of the cam in a first direction to cause movement of the cam follower in a second different direction."

### d.    Defendant's construction

Defendants propose that "camming mechanism" be construed to mean "a mechanism which transforms rotary motion into linear motion."  Defendants are improperly attempting to read the claim term based only on the single embodiment disclosed.  However, patentee in no way "demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."

The '086 Patent does not provide a definition of "camming mechanism" because this term was at the time well understood by one of ordinary skill in the art.  Unlike Defendants' overly restrictive definition, one of ordinary skill in the art would understand that a camming mechanism may also, for instance, transform linear motion into linear motion via what is typically called a linear cam, a good example of which is shown in defining a linear cam at D&Tonline.org (Ex. 16).

### 4.    ratchet mechanism

Claims 1 and 9 of the '086 Patent disclose a security device comprising in part "... a ratchet mechanism connected to the spool ...".  (Col. 8:17; Col. 9:1).

### a.    Construction of "ratchet mechanism"

"Ratchet mechanism" should be given its ordinary and customary meaning.

### b.    Defendants' construction

Defendants assert that "ratchet mechanism" is indefinite citing the '086 Patent generally. The Examiner made no objection or rejection as to "ratchet mechanism" being indefinite.

### 5.    locking member

Claim 2 of the '086 Patent discloses:  "The security device defined in claim 1 including a locking member preventing the camming mechanism from moving the first and second plurality of ratchet teeth out of engagement when in a locked position."  (Col. 8:28-31).  Claim 3 of the '086 Patent discloses:  "The security device defined in claim 1 including a key operatively engageable with the locking member enabling the camming mechanism to disengage the first and second plurality of ratchet teeth placing the spool in the cable-loosening direction."  (Col. 8:32-36).

*a.*      *Construction of "locking member"*

"Locking member" should be given its ordinary and customary meaning.

*b.*      *Defendants' construction*

Defendants assert that "locking member" is indefinite, citing the '086 patent generally. The Examiner in the '086 patent never made any objection or rejection as to "locking member" being indefinite.

**6.     key**

Claim 3 of the '086 Patent discloses:  "The security device defined in claim 1 including a key operatively engageable with the locking member enabling the camming mechanism to disengage the first and second plurality of ratchet teeth placing the spool in the cable-loosening direction."  (Col. 8:32-36).

*a.*      *Construction of "key"*

"Key" should be given its ordinary and customary meaning.

*b.*      *Defendants' construction*

Defendants assert that "key" means "a component integrated into the security device which is configured to fit in a recess in the base of the device and rotate therein."  Defendants are attempting to read language from the specification into Claim 3 and in particular based on the

17

single embodiment of the '086 Patent.  With respect to the term issue, patentee in no way demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.  In addition, Defendants' reference to the '966 prosecution history is inapplicable because the '966 Patent is a continuation-in-part of the '086 Patent, and describes a security device which operates differently than the security device of the '086 Patent.

### 7.    *top wall portion rotatably mounted on a cylindrical sidewall*

Claim 6 of the '086 Patent, a claim dependent on Claim 1, discloses a security device comprising in part "a top wall portion rotatably mounted on a cylindrical sidewall of the housing and operatively connected to the spool ...".  (Col. 8:47-49).

#### a.    *Construction of "top wall portion rotatably mounted on a cylindrical sidewall"*

"Top wall portion rotatably mounted on a cylindrical sidewall" should be given its ordinary and customary meaning.

#### b.    *Defendants' construction*

Defendants propose that this term be construed as "top wall portion rotatably attached to, and on top of, a cylindrical sidewall."  Nothing in the '086 Patent shows, describes or implies the construction proposed by Defendants.  Defendants are simply attempting to change the plain meaning of the present term by adding additional language.

### 8.    *the spool includes the first plurality of ratchet teeth operatively connected thereto*

Claim 10 of the '086 Patent dependent upon Claim 9, discloses a security device comprising in part "... the spool includes the first plurality of ratchet teeth operatively connected thereto ...".  (Col. 9:12-13).

#### a.    *The specification*

The '086 Patent at 5:50-67 indicates that gear disc 75 having teeth 76 is mounted on and rotatable with spool 40.

> b.    Construction of "the spool includes the first plurality of ratchet teeth operatively connected thereto"

"The spool includes the first plurality of ratchet teeth operative connected thereto" should be construed "the spool having the first plurality of ratchet teeth mounted thereto."

> c.    Defendants' construction

Defendants propose to isolate "operatively connected" to mean "directly physically connected to achieve a mechanical effect."  This overly restrictive construction finds no support in the patent or its file history.

C.    The '495 Patent and the '310 Patent

1.    *integrated theft deterrent device*

Claims 1, 14, 15, 16, and 18 of the '495 Patent disclose an "integrated theft deterrent device."  (Col. 5:30; Col. 6:21-22; Col. 6:43; Col. 7:1; Col. 8:3).  Claims 1 and 17 of the '310 Patent disclose an "integrated theft deterrent device."  (Col. 5:29; Col. 6:34).

> a.    The claims

"The appropriate starting point ... is always with the language of the asserted claim itself." *Flexsys America,* 695 F.Supp. 2d at 613.  Claim 1 of the '495 Patent recites "the lanyard having a first end and a second end, with the first end inaccessibly coupled within an aperture of the tag body" and "a pin being permanently connected to the second end of said lanyard."  Claim 14 of the '495 Patent recites "a first end of the lanyard is maintained by the tag body" and "said pin attached to the second end of the lanyard."  Claim 15 of the '495 Patent recites "a lanyard extending from within said tag body" and "a pin being permanently connected to the second end of said lanyard."  Claim 1 of the '310 Patent recites "a lanyard extending from within said tag body" and "a pin being permanently connected to said lanyard."  Claim 17 of the '310 Patent

recites "the lanyard having a first end and a second end, with the first end maintained within an aperture of the tag body" and "a pin being permanently connected to the second end of said lanyard." Each independent claim found in the '495 Patent and '310 Patent requires a first end of the lanyard which is either "inaccessibly coupled within," "maintained by/within," or "extending from within" the tag body. Further, each independent claim also requires a pin "attached" or "permanently connected" to a second end of the lanyard. Thus, the claims themselves supply one skilled in the art with the understanding that the term "integrated theft deterrent device" denotes a permanent connection between the pin, lanyard, and tag body.

b.      The specifications

"[I]t is a fundamental rule that claims must be construed so as to be consistent with the specification." *Id.* (citation omitted). The specifications repeatedly tout the benefits of permanently combining the tag body, pin, and lanyard into a single unit. For example, "The prior art does not address the need for an integrated EAS tag that is difficult to defeat and easy to use. In addition, the prior art fails to provide a theft deterrent tag assembly that incorporates the pin, a lanyard and the tag body into one unit." ('495 Col. 2:29-33; '310 Col 3:34-37). "Therefore, it is a primary objective of the invention to provide an EAS tag wherein the tag body and pin are an integrated unit." ('495 Col. 2:44-46; '310 Col. 2:48-50). "It is a further objective of the invention to provide an EAS tag that provides an integrated pin to reduce the chances of injury to persons stepping on the pin, as is commonly a problem with the pins utilized in the prior art." ('495 Col. 2:54-57; '310 Col 2:58-61). One skilled in the art would readily understand the term "integrated theft deterrent device" to be a theft deterrent device wherein all of the elements are permanently incorporated into one unit.

In addition to describing which elements are integrated into a single unit, the specifications describe the benefits of such integration:

> In keeping with the principles of the present invention, a unique EAS theft deterrent tag is disclosed *wherein the pin element is integrated into the tag body via an elongated element*.  In integrating the pin component with the tag body, labor time and costs are reduced when removing the tag from an article being protected thereby because separate bins are not required for storing the tag body and the pin component until they are reused.  In addition, labor time and costs during attachment of the tag body to an article are also reduced because the pin component is integrated therewith and a separate search for a corresponding pin is eliminated.  ('495 Col. 2:65-67 – Col. 3:1-7; '310 Col 3:1-11). (*emphasis added*).

Clearly, the applicant intended the term "integrated" to mean that the pin is permanently incorporated into the tag body via the lanyard (i.e. "elongated element").  One skilled in the art would readily understand that "separate bins are not required for storing the tag body and pin component" because these components are incorporated permanently into a single unit.

### c.     The prosecution history

The prosecution history of the '495 Patent confirms the definition of "integrated theft deterrent device."  In response to the Examiner's rejection of the claims as unpatentable, the applicants conducted a telephonic interview with the Examiner in an attempt to overcome the rejection.  The Examiner recounted:  "The Applicant has contended that the lanyard of the present invention is made permanently attached to the tag body while the lanyard of the reference is removable.  The Applicant believes this feature should be considered inventiv (sic)."  (Examiner Interview Summary, 09/06/2006) (Ex. 19).  Further, the applicant stated "Applicant asserted that Fujiuchi fails to at the very least to teach the limitation of Applicant's Claim 1 wherein the lanyard has one end permanently fixed within the tag body."  (Applicant Interview Summary, 10/05/2006). (Ex. 20)  Note that *both* the Examiner and the applicant used the term "permanently" to describe how the lanyard is connected with the tag body.

Applicants argued during prosecution of the '495 Patent that the lanyard was permanently or non-removably attached to the tag body even before language such as "inaccessibly coupled"

was first introduced by amendment.  Original Claim 1 of the '495 Patent recited in part, "a lanyard 38 extending from within said tag body 20; a pin 48 being permanently connected to said lanyard 38 at an end opposing said tag body 20."  (See page 11 of the '495 application.)  (Ex. 21) Original Claim 19 of the '495 Patent recited in part, "defining an aperture 36 of a predetermined size ... through said first half 22; inserting a lanyard 38 through said aperture 36, said lanyard 38 having a first end 40 and a second end 42; attaching an anchor 44 of sufficient size to said first end 40 such that anchor 44 cannot pass through aperture 36 ... sonic welding said first half 22 and said second half 24 to enclose said anchor 44 ... attaching a pin 48 to said second end of said lanyard."  (See page 13 of the '495 application.) (Ex. 21)

While Claims 1 and 19 were in their original state, Applicants argued at page 2 of the August 8, 2006 Amendment of the '495 Patent (Ex. 22):

> Regarding Claim 1, Fujiuchi fails to teach Applicant's limitation of "a lanyard 38 extending from within said tag body 20."  Fujiuchi teaches away from Applicant's claimed invention in that the lanyard does not extend from within the tag body, but is instead fully detachable from the tag body as illustrated in Figure 3, reference numerals 30 and 30a.  Fujiuchi's lanyard is susceptible to being lost, whereas one end of Applicant's lanyard is maintained within the tag body and cannot fully detach from the body."

In addition, Applicants argued: "Furthermore, one end of Applicant's device is always maintained within the tag body." at the August 8, 2006 Amendment, page 3 (Ex. 22); and, "As such, Fujiuchi fails to teach or render obvious Applicant's anchor which maintains one end of the lanyard within the tag body in an irremovable manner." _Id._ at pages 4-5; and, "Regarding Claim 19, the Office Action incorporated its reasoning behind the rejections of Claims 1 and 9. Accordingly, Applicant incorporates the responses herein of the subject claims and respectfully asserts that Claim 19 is neither anticipated nor rendered obvious by Fujiuchi." _Id._ at page 8.

Checkpoint reemphasizes that these arguments were made before the first amendment to the claims in which Claim 1 was amended to indicate that the first end of the lanyard was

"*inaccessibly coupled* within an aperture 36 of the tag body 20 by an anchor 44 attached to the first end 40" and Claim 19 was amended to require "*inaccessibly coupling* a first end 40 of a lanyard 38 within aperture 36." (*emphasis added*). (Ex. 23) Clearly, the Applicant intended the claims to disclose a permanently assembled unit.

<em>d.</em>    <em>Construction of integrated theft deterrent device</em>

Given the specifications and prosecution history of the patents together with the prior art, an "integrated theft deterrent device" is a "theft deterrent assembly in which the tag body, pin and lanyard are incorporated permanently into a single unit."

<strong>2.</strong>    <strong><em>apex</em></strong>

Claims 1 and 15 of the '495 Patent disclose an integrated theft deterrent device comprising in part "... an apex region extending from said tag body such that the apex region causes the tag body to a side ...". (Col. 5:40-41; Col. 5:60-61). Claim 14 of the '495 Patent discloses a method of manufacturing an integrated theft deterrent device comprising in part "... providing an apex region on tag body such that said pin is maintained in horizontal alignment with a flat surface ...". (Col. 6:39-41). Claim 17 of the '310 Patent discloses an integrated theft deterrent device comprising in part "... an apex region extending from said tag body such that the apex region causes the tag body to a side ...". (Col. 6:43-44).

<em>a.</em>    <em>The specifications</em>

When read in the context of the specifications of the '495 Patent and '310 Patent, "apex" is used to describe an area of the second half which forces the tag to pivot to one side when the tag is placed on a surface. The specifications disclose: "Second half 24 has an apex region 25 that extends therefrom in an opposing direction to first half 22 in a substantially dome shaped manner. The dome shaped apex region 25 forces tag 20 to fall onto its side…" ('495/'310 Col. 4:3-7). Further, all of the drawings of the patents show a substantially dome shaped "apex

23

region" indicated as element 25. Inasmuch as Applicant refers to this area as an "apex region," one skilled in the art understands that this is a region on the tag which includes a pointed or climactic portion, possibly in the shape of a dome.

### b. Construction of "apex"

Given the specifications of the '495 and '310 Patents, "apex" is the singular point positioned furthest away from the tag body.

### 3. horizontal alignment

Claims 1 and 15 of the '495 Patent disclose an integrated theft deterrent device comprising in part "... the apex region causes the tag body to a side such that the pin is maintained in horizontal alignment with a flat surface ...". (Col. 5:41-43; Col. 6:60-63). Claim 14 of the '495 Patent discloses a method of manufacturing an integrated theft deterrent device comprising in part "... said pin is maintained in horizontal alignment with a flat surface on which the tag body rests ...". (Col. 6:40-42). Claim 17 of the '310 Patent discloses an integrated theft deterrent device comprising in part "... the apex region causes the tag body to a side such that the pin is maintained in horizontal alignment with a flat surface ...". (Col. 6:43-45).

### a. The specifications

The specifications of the '495 Patent and '310 Patent describe how "the risk of work place injury is reduced because when the tag body falls on the floor, *the pin also lays flat on the floor* and should not penetrate the foot of an employee stepping thereon." ('495 Col. 3:9-12; '310 Col. 3:12-15, *emphasis added*). Thus, "horizontal alignment" requires a parallel relationship between the surface and the pin.

### b. Construction of "horizontal alignment"

The ordinary and customary meaning of "horizontal" and "alignment" mean "parallel with the surface upon which the tag body is resting."

### 4. *extending inwardly*

Claims 1 and 15 of the '495 Patent disclose an integrated theft deterrent device comprising in part "... a first half and a second half that are joined around a perimeter of said tag body by a first sidewall and a second sidewall extending inwardly from said first and second halves respectively ...".  (Col. 5:45-48; Col. 6:51-54).  Claim 14 of the '495 Patent discloses a method of manufacturing an integrated theft deterrent device comprising in part "... providing a first half and a second half that are joined around a perimeter of said tag body by a first sidewall and a second sidewall extending inwardly from said first and second halves respectively ...".  (Col. 6:24-27).  Claims 1 and 17 of the '310 Patent disclose an integrated theft deterrent device comprising in part "... a first half and a second half that are joined around a perimeter of said tag body by a first sidewall and a second sidewall extending inwardly from said first and second halves respectively ...".  (Col. 5:40-43; Col. 6:53-56).

### c. *The specification and file history*

Neither the specification nor the file history defines "extending inwardly" with respect to the first and second halves.  However, it is clear from the specification and the file history that any reference to "in" (e.g. therein, within, inwardly) refers to the interior cavity of the tag body.  For example, the anchor is described as "securely maintained with*in* tag 20." ('495/'310 Col. 4:36-37, *emphasis added*).  Further, an essentially identical term "extends inwardly" is used to describe the reinforcement wall 46, which extends in to the interior cavity of the tag body: "a reinforcement wall 46 [...] *extends inwardly* from top half 22 and further defines aperture 36" ('495/'310 Col. 4:37-39, *emphasis added*).  Note that in Fig. 4 of the patents, reinforcement wall 46 extends inwardly in one direction, while in Fig. 6 of the patents, reinforcement wall 46 extends inwardly in a direction perpendicular relative to that of Fig. 4.  Inasmuch as these directions are perpendicular, it follows that one of these "inwardly" extending reinforcement

walls cannot meet Defendants' definition of extending toward the perimeter junction. However, both directions do meet Checkpoint's definition and extend toward the interior cavity of the tag body.

Checkpoint's construction of "extending inwardly" is further buttressed by use of the antonym term "extends outwardly" to described the extension barrier 58: "wherein an extension barrier 58 *extends outwardly* from first half 22: ('495/'310 Col. 4:59-60, *emphasis added*). See Fig. 3 of the '495 Patent. Whether the element is extending inwardly or extending outwardly, it is clear from the above that in/out is relative to the inner cavity of the tag body.

In an amendment submitted on April 6, 2007 (Ex. 24), Applicant included the following claim:

> 9.    The device of claim 1, wherein said tag body 30 further comprises:
>
> A first half 22 and a second half 24 that are joined around a perimeter of said tag body 20 by a first side wall 26 and a second side wall 28 extending inwardly from said first and second halves respectively; the opening 30 being defined by said first half 22 for receiving said pin 48; and the aperture 36 being defined by said first half 22 through which said lanyard 38 emanates.

The Examiner indicated that Claim 9 as written was "objected to as being depending upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." (06/26/2007, Office Action, Page 5) (Ex. 25). As such, the Examiner believed this feature to be new and novel in view of the prior art. However, if this term is construed as Defendants suggest, the prior art demonstrates this feature and the Examiner would have immediately recognized this. For example, Defendants' own patent, D427,929 (Ex. 26), which issued 4 years before Applicant filed the '495 application demonstrates a security device with two halves "extending toward the perimeter junction of the first and second halves" as shown below:



In view of the prior art available to the Examiner, the Examiner asserted that two halves which extend inwardly is a novel feature in the art. As such, it would be nonsensical to construe the term to mean what was *already known* in the prior art, as Defendants' propose.

> d.       Construction of *"extending inwardly"*

"Extending inwardly" means "extending in to the interior cavity of the tag body."

> e.       *Defendants' construction*

Defendants propose to construe the term "extending inwardly" to mean "extending toward the perimeter junction of the first and second halves." As shown above, this concept is well known in the prior art and would not have resulted in an allowance of the claims if the Examiner understood the term to mean what the Defendants propose.

> f.       *A comparison of constructions*

Checkpoint proposes to construe this term as "extending in to the interior cavity of the tag body," while Defendants propose to construe the term as "extending toward the perimeter junction of the first and second halves." A cross-sectional representation of the two proposed constructions is shown below, with Fig. 1 representing Checkpoint's proposed construction and Fig. 2 representing Defendants' proposed construction.



5.    *extending from within said tag body*

Claims 1 and 15 of the '495 Patent disclose an integrated theft deterrent device comprising in part "... a lanyard extending from within said tag body ...".  (Col. 5:33; Col. 6:45). Claims 1 and 17 of the '310 Patent disclose an integrated theft deterrent device comprising in part "... a lanyard extending from within said tag body ...".  (Col. 5:32: Col. 6:38).

a.    *The specifications*

Checkpoint incorporates all prior arguments made with respect to "integrated theft deterrent device" as the term "extending from within said tag body" is a logical extension of the "integrated" concept.  The specifications disclose that "[a]nchor 44 securely maintains lanyard 38 within tag 20."  ('495 Col. 4:37-38; '310 Col. 4:37-38).  The phrase "securely maintains" describes a permanent coupling of the lanyard to the tag body.  This description is reinforced by the related passages regarding the overall integration of the pin, lanyard, and tag body (see previous discussion) into a security device.

b.    *Construction of "extending from within said tag body"*

"Extending from within said tag body" means "permanently connected to the tag body."

6.    *maintained by the tag body*

Claim 14 of the '495 Patent discloses a method of manufacturing an integrated theft deterrent device comprising in part "... a first end of the lanyard is maintained by the tag body ...".  (Col. 6:30-31).

a.    *Construction of "maintained by the tag body"*

Checkpoint incorporates its prior contentions for previous claim terms in the '495 Patent and '310 Patent.  "Maintained by the tag body" means "permanently connected to the tag body."

7.    *anchor is securely maintained within tag body*

28

Dependent Claims 3 and 10 of the '310 Patent disclose the integrated theft deterrent device of Claim 1 comprising in part "... anchor is securely maintained within tag body." (Col. 5:56-57; Col. 6:18-19).

> a.    *The specification*

Checkpoint hereby incorporates by reference all prior arguments made with respect to the term "integrated theft deterrent device," as the term "anchor is securely maintained within tag body" is a logically related extension of the "integrated" concept.  For example, "[a]pplicant asserted that Fujiuchi fails to at the very least to teach the limitation of Applicant's Claim 1 wherein the lanyard has one end permanently fixed within the tag body." ('495 File History, Applicant Interview Summary, 10/06/2006) (Ex. 20).

The relationship between the anchor, lanyard, aperture, and tag body is described in the specification of the '310 Patent primarily at Col. 4:28-45 and shown in Figs. 4 and 6.  The specification describes how the lanyard is passed through the aperture formed in one half of the tag body and an anchor is secured thereon to prevent the lanyard from being removed.  The anchor is formed to have "a greater diameter than the aperture 36" ('495/'310 Col. 4:31-32) to ensure "anchor 44 securely maintains lanyard 38 within tag 20." ('495/'310 Col. 4:37-38).  The patent drawings show the described configuration in Figs. 4 and 6, by showing the anchor as an enlarged cylinder (element 44) attached to one end of the lanyard and disposed in the tag body.  The anchor shown in Figs. 4 and 6 is sized significantly larger than the aperture, such that it could not be withdrawn through the aperture.  Further, the specification describes that "[a]fter lanyard 38 has passed through aperture 36 and anchor 44 engaged therein, first half 22 and second half 25 are sonic welded together, thereby enclosing anchor 44 therein." ('495/'310 Col. 4:42-45).  Sonic welding creates a solid-state weld between two plastics, essentially reforming and melting two parts into one.  Therefore, disposing the anchor between the first half and the

second half and thereafter sonically welding the two halves together would inherently permanently dispose the anchor in the tag body.

Finally, the phrase "securely maintained" conveys to one skilled in the art that there is a permanent coupling of the lanyard to the tag body. This conforms to the numerous related disclosures in the specification and file history regarding the same (see previous discussion regarding "integrated theft deterrent device"). Thus, the term "anchor is securely maintained within the tag body" requires permanence.

>     b.     Construction of *"anchor is securely maintained within tag body"*

Given the specification of the '310 Patent, "anchor is securely maintained within tag body" means anchor is "permanently held in the interior cavity of the tag body."

>     **8.     *maintained within an aperture of the tag body***

Claim 17 of the '310 Patent discloses an integrated theft deterrent device comprising in part "... the lanyard having a first end and a second end, with the first end maintained within an aperture of the tag body by an anchor attached to the first end ...". (Col. 6:38-40).

>     a.     *The specification and file history*

The word "maintained" in the claim term conveys to one skilled in the art that there is a permanent coupling to the tag body. This conforms to the numerous related disclosures in the specification and file history regarding the same (see previous discussions regarding "integrated theft deterrent device" and "anchor is securely maintained within tag body"). Thus, the term "maintained within an aperture of the tag body" requires permanence.

>     b.     Construction of *"maintained within an aperture of the tag body"*

"Maintained within an aperture of the tag body" means "permanently held in an aperture of the tag body."

Respectfully submitted,

/s/ James F. McCarthy III
James F. McCarthy III (0002245)
Trial Attorney for Defendant
Sand & Sebolt
Aegis Tower
4940 Munson Street, N.W., Suite 1100
Canton, Ohio 44718
Telephone: (330) 244-1174

Steve Weiss
(weiss@sw.com)
Robert J. Palmersheim
(palmersheim@sw.com)
Bradley P. Nelson
(nelson@sw.com)
Marcus D. Fruchter
(fruchter@sw.com)
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
Telephone: (312) 701-9300

and

Joseph A. Sebolt
(joes@sandandsebolt.com)
Matthew Delaney
(matthewd@sandandsebolt.com)
Sand & Sebolt
Aegis Tower
4940 Munson Street, N.W., Suite 1100
Canton, Ohio 44718
Telephone: (330) 244-1174

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically this 28th day of September, 2012.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ James F. McCarthy III
James F. McCarthy III

KTBH: 4812-8099-0737, v.  2

U.S. Patent No. 7,342,495
Date of Patent: Mar 11, 2008

U.S. Patent No. 7,969,310
Date of Patent: Jun 28, 2011

| Ref. No. | Claim Term | Claims | Checkpoint Construction | USS/Cent Construction |
|---|---|---|---|---|
| 1 | integrated theft deterrent device | 1, 14, 15, 16, 18<br>1, 17 | a theft deterrent assembly in which the tag body, pin, and lanyard are incorporated permanently into a single unit | ordinary meaning |
| 2 | apex | 1, 14, 15<br>17 | the singular point positioned furthest away from the tag body | ordinary meaning |
| 3 | horizontal alignment | 1, 14, 15<br>17 | parallel with the surface upon which the tag body is resting | ordinary meaning |
| 4 | extending inwardly | 1, 14, 15<br>1, 17 | extending into the interior cavity of the tag body | extending toward the perimeter junction of the first and second halves |
| 5 | extending from within said tag body | 1, 15<br>1, 17 | permanently connected to the tag body | ordinary meaning |
| 6 | maintained by the tag body | 14 | permanently connected to the tag body | ordinary meaning |
| 7 | anchor is securely maintained within tag body | 3, 10 | anchor is permanently held in the interior cavity of the tag body | ordinary meaning |
| 8 | maintained within an aperture of the tag body | 17 | permanently held in an aperture of the tag body | ordinary meaning |

U.S. Patent No. 7,481,086
Date of Patent: Jan 27, 2009

| Ref. No. | Claim Term | Claims | Checkpoint Construction | USS/Cent Construction |
|---|---|---|---|---|
| 1 | first and second plurality of ratchet teeth extending about a common axis | 1 | first and second plurality of ratchet teeth rotatable about a common axis | first an second plurality of ratchet teeth extending radially inward or outward , respectively, about a common axis |
| 2 | said first member and the spool extending about a common axis | 9 | said first member and the spool rotatable about a common axis | said first member and the spool extending radially outward about a common axis |
| 3 | camming mechanism | 1, 11 | a mechanical mechanism having a cam and a cam follower such that the cam slidably engages the cam follower during movement of the cam in a first direction to cause movement of the cam follower in a second different direction | a mechanism which transforms rotary motion into linear motion |
| 4 | ratchet mechanism | 1, 9 | ordinary meaning | indefinite |
| 5 | locking member | 2, 3 | ordinary meaning | indefinite |
| 6 | key | 3 | ordinary meaning | a component integrated into the security device which is configured to fit in a recess in the base of the device and rotate therein |
| 7 | top wall portion rotatably mounted on a cylindrical sidewall | 6 | ordinary meaning | top wall portion rotatably attached to, and on top of, a cylindrical sidewall |
| 8 | the spool includes the first plurality of ratchet teeth operatively connected thereto | 10 | the spool having the first plurality of ratchet teeth mounted thereto | directly physically connected to achieve a mechanical effect |

4839-3677-0577 v.1

U.S. Patent No. 7,251,966
Date of Patent: Aug 7, 2007

| Ref. No. | Claim Term | Claims | Checkpoint Construction | USS/Cent Construction |
|---|---|---|---|---|
| 1 | first structure | 1, 38, 42 | a structure in which the internal spool is disposed | indefinite |
| 2 | unlocking mechanism | 1, 38, 42 | ordinary meaning | bottom wall with a central opening, through which the axis passes, for receiving a key end | means plus function limitation (35 U.S.C. § 112(6)) |
| 3 | a force applied via the unlocking mechanism moves one of the first and second engaging member axially | 1, 38, 42 | ordinary meaning | a force applied by an external key moves one of the first and second engaging members axially in the direction of movement of the key end | |
| 4 | ratchet teeth arranged in an annular fashion along a common circle | 1 | ordinary meaning | ratchet teeth extending radially inward from an annular wall relative to the axis | |