# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

CHECKPOINT SYSTEMS, INC.,      )     CASE NO.  5:11CV1199
                                )
                PLAINTIFF,      )     JUDGE SARA LIOI
                                )
vs.                                     )
                                )     MEMORANDUM OPINION
                                )
HANGZHOU CENTURY CO., LTD      )
d/b/a CENTURY PLASTIC &      )
ELECTRONIC CO., LTD., et al.,      )
                                )
               DEFENDANTS.      )

Plaintiff Checkpoint Systems, Inc. ("Checkpoint") filed the above-captioned case on June 10, 2011, alleging infringement of two of its patents by defendants, Hangzhou Century Co., Ltd. d/b/a Century Plastic & Electronic Co., Ltd., and Universal Surveillance Corporation d/b/a Universal Surveillance Systems (for ease of discussion, defendants shall be collectively referred to as "USS"). Defendant USS, in turn, filed a counter-claim alleging infringement of two of its patents. The patents-in-suit all relate to security devices used to detect and deter retail merchandise theft, referred to in the industry as electronic article surveillance ("EAS") systems.

A court's first task in determining whether an accused device or process infringes a patent is to construe the claims to ascertain their proper scope. *Lockheed Martin Corp. v. Space Systems/Loral*, *Inc.*, 324 F.3d 130, 1318 (Fed. Cir. 2003). Accordingly, the parties came before the Court for a hearing on the proper construction to be accorded the claims in the subject patents, commonly referred to as a *Markman*

hearing. *See Markman v. Westview Instruments*, *Inc*., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). Prior to the *Markman* hearing, the parties conducted a tutorial for the benefit of the Court, wherein the technology behind the patents-in-suit was explained. At the Court's request, the parties submitted pre-hearing and post-hearing briefs on a variety of issues relating to claim construction.[1] Upon consideration of the parties' briefs, argument and the presentation of exhibits, the Court construes the disputed terms as set forth herein.

### I.  BACKGROUND

For purposes of this litigation, Checkpoint is the holder of two patents: United States Patent No. 7,251,966 Cable Wrap Security Device (the '966 patent), and United States Patent No. 7,481,086 Cable Wrap Security Device (the '086 patent). USS is also the holder of two subject patents: United States Patent No. 7,342,495 Integrated Theft Deterrent Device (the '495 patent), and United States Patent No. 7,969,310 Integrated Theft Deterrent Device (the '310 patent). The '310 patent is a continuation of the '495 patent, and the two share a common specification.

*The Technology*

Though all designed to address the growing problem of retail merchandise theft, each set of patents reveals vastly different devices. The '966 and '086 patents disclose a security device which typically includes a plurality of wires or cables which encircle and lock all six sides of a box, package, book or other similar structure. In

---

[1] Following the initial *Markman* hearing, the Court conducted a second hearing by telephone, for the purpose of addressing two issues first raised in the *Markman* hearing, and for which the Court desired clarification.

contrast, the '495 patent and its continuation patent (the '310 patent), contain claims that are directed to a tag body containing two halves, and a pin at the end of a lanyard that can be inserted into the tag body through an opening to lock the device around or through a piece of merchandise. The '495 patent also discloses a method of manufacturing the EAS system.

The devices at issue afford the retailer two layers of protection from shoplifting. First, because the devices lock into place either around or through the merchandise, they can only be removed without damaging the merchandise by a store employee through the use of a separate, magnetized instrument. Second, each patented device emits an electronic signal that can be read by sensors contained in towers positioned at the store's exits. If the signal is not properly disabled by authorized store personnel upon purchase, it will set off an alarm should a customer attempt to covertly remove the merchandise from the store.

## II.  LEGAL STANDARD

Claim construction is a matter of law to be decided exclusively by the Court. *Markman v. Westview Instruments*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Claim terms are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic*, *Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the

invention, i.e., as of the effective date of the patent application." *Id.* at 1313. Absent an express intent to the contrary, a patentee is presumed to have intended the ordinary meaning of a claim term. *York Prods. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996).

In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and the prosecution history (if in evidence). *Phillips*, 415 F.3d at 1313. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582. "The appropriate starting point . . . is always [] the language of the asserted claim itself." *Comark Commc'n v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

The claims also "must be read in view of the specification, of which they are a part." *Phillips*, 445 F.3d at 1315. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. By expressly defining terms in the specification, an inventor may "choose . . . to be his or her own lexicographer," thereby limiting the meaning of the disputed term to the definition provided in the specification. *Johnson Worldwide Assocs.*, *Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). Although claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187. However, it is a

4

fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistent with that limitation. *Id*.

Courts also may consider the patent's prosecution history, if in evidence. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Techs.*, *Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). The prosecution history "constitutes a public record of the patentee's representations concerning the scope of and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct." *Seachange Int'l*, *Inc. v. C-COR*, *Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (quoting *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)). The prosecution history may reveal "whether the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms." *Id*. (internal citation omitted). "Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language." *Id*. (citations omitted). Any such disclaimer must be clear and unambiguous. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-25 (Fed. Cir. 2003). Courts must remain mindful, however, that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317 (citations omitted).

5

In most circumstances, analysis of the intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Extrinsic evidence may be considered, as it "'can shed light on the relevant art,' but is less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. ITC*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)). Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, the court may appropriately consult "trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id*. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id*. at 1319.

In construing claims, the Court determines whether or not a term requires construction. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The Court is not required to accept a construction of a term, even if the parties have stipulated to it, but instead may arrive at its own construction of claim terms, which may differ from the constructions proposed by the parties. *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005).

6

### III. THE UNDISPUTED CLAIM

#### *Axially*

The parties agree that the term "axially" in the '966 patent should be construed as "in the direction of or along the claimed axis." (Doc. No. 76 at 1878.)[2] The Court adopts the parties' agreed construction.

### IV. THE DISPUTED CLAIMS AND THE COURT'S CLAIM CONSTRUCTION

The parties disagree as to the meaning of twenty (20) terms and phrases and, therefore, seek construction from the Court.

#### A.     '966 Patent Claim Terms

##### *First Structure*

The phrase "first structure" appears in claims 1, 38, and 42 of the '966 patent. USS contends that "first structure" is indefinite because the phrase has no clear and definite meaning on its own and is not mentioned in the specification such that a person of ordinary skill in the art would be apprised of its scope.

Reading the claim language in light of the specification and the figures, and deriving additional support from the prosecution history and use of the phrase in prior art, Checkpoint argues that the scope of the phrase "first structure" can be understood by a person of ordinary skill in the art. Checkpoint's proposed construction of "first structure" is "a structure in which the internal spool is disposed."

---

[2] References to specific pages in the record are made to the continuous pagination applied to the document headers by the electronic docketing system.

Each claim in a patent is presumed to be valid. 35 U.S.C. § 282(a). A party seeking to overcome the statutory presumption of validity by proving indefiniteness must do so by clear and convincing evidence. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77 (Fed. Cir. 2001). A claim is not indefinite "merely because it proposes a difficult issue of claim construction." *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Rather, "if the meaning of the claim is discernible, 'even though the task may be formidable and the conclusion may be one over which reasonable persons disagree, [the Federal Circuit] has held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.'" *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004) (quoting *Exxon*, 265 F.3d at 1375). "Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citation omitted). An express definition of a claim term is not necessary "if the meaning of the term is fairly inferable from the patent . . . ." *Bancorp*, 359 F.3d at 1373. "[C]lose questions of indefiniteness . . . are properly resolved in favor of the patentee." *Id.* at 1371 (quoting *Exxon Research*,  265 F.3d at 1380).

"First structure" does not appear in the specification and is not defined anywhere in the intrinsic record. The claim language, however, provides some information as to what constitutes the "first structure." Independent claims 1 and 38 disclose, in part, "an internal spool which is rotatable relative to the first structure about an axially extending axis" and "first and second engaging members mounted respectively on the first structure and the spool." Independent claim 42 recites, in part, "a first engaging member mounted on the first structure[.]" Dependent claim 4 discloses, in part,

8

"the first structure includes the first retaining element and a housing which defines an interior chamber in which the spool is disposed[,]" and dependent claim 18 recites, in part, "the first structure includes a housing . . . defin[ing] a housing cavity in which the spool is disposed[.]"

Language in the specification provides further guidance for understanding some of the components described as part of the "first structure" in the claims. In the description of the preferred embodiment, the "housing" is described as including, among other things, "a substantially flat and circular bottom wall and a cylindrical sidewall which extends upwardly from bottom wall and is concentric about axis C" and an "[a]nnular top wall and "top ring." ('966 patent Col. 10:7–10:45.)

Other aspects of the description of the "housing" make interpretation more difficult by ascribing additional elements to the "housing" that cannot be reconciled with the claim language. The "first engaging member" is described as part of the "housing," (*Id.* Col. 12:35–39), which is described in certain dependent claims as part of the "first structure," but the independent claims also make clear that the first engaging member is a separate element mounted on the first structure, not part of it. Similarly, the "retaining mechanism" is described as part of the housing, (*Id.* Col. 12: 43), but dependent claim 4 indicates that the "first retaining element," part of the "retaining mechanism," is separate from the "housing."

Construing "first structure" is further complicated by the doctrine of claim differentiation. Stemming from "the common sense notion that different words or phrases used in separate claims are presumed to indicate that claims have different meanings and scope[,]" *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir.

9

1999), "the doctrine is at its strongest 'where the limitation sought to be 'read into' an independent claim already appears in a dependent claim . . . .'" *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368–69 (Fed. Cir. 2005) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). However, the doctrine "only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368  (Fed. Cir. 2000) (quotation marks and citation omitted). Nevertheless, as applied to dependent claim 4, claim differentiation creates a presumption that the "first structure" contains more than simply the first retaining element and the housing. Paradoxically, then, the only areas in the entire '966 patent where specific elements are mentioned as being part of the "first structure"—dependent claims 4 and 18—are also the only areas that are legally presumed not to delineate all of its elements.

        In support of "first structure" having a definite construction, Checkpoint identifies two examples in the prosecution history of the examiner recognizing a first structure in prior art. First, in the June 5, 2006 Office Action (Doc. No. 68 at A-46), where "a first structure (50)" is denoted in the '266 patent, and, second, in the January 25, 2007 Office Action (*Id.* at A-68), where "a first structure (10)" is recognized in the '028 patent. Emphasizing that the figures in those examples of prior art show the internal spool to be disposed within the "first structure," Checkpoint claims, bolsters its proposed construction.

        Closer examination of the cited prior art, however, shows a lack of support for Checkpoint's stance. Part 50 in the '266 patent and part 10 in the '028 patent are actually defined in their respective specifications as a "housing" (*Id.* at A-63 Col. 5:9–10)

10

and a "base" (*Id.* at A-82 Col. 2:27), not a "first structure."[3] Indeed, the term "first structure" does not appear in either of the prior art patents cited by Checkpoint. As for the claim terms of the prior art, the "housing" appears in a dependent claim in the '266 patent, along with several other structures, all of which are required by the claim language. In the '028 patent, the "base" described as a "first structure" by the examiner in the January 25, 2007 Office Action does not appear in the claim terms at all.

In the final analysis, "first structure" is simply not amenable to construction. Because the specification does not mention the "first structure" by name, a person of ordinary skill in the art would have no way to know which elements constitute the "first structure." Individual elements of the "first structure" only appear in dependent claims, which are presumed not to include all of the elements, and no argument has been made to rebut that presumption.[4] Even where dependent claims mention individual elements of the "first structure," the specification contradicts their components.

Accordingly, the Court holds that "first structure" is indefinite. Because "first structure" appears in every independent claim of the '966 patent, every claim, independent and dependent, is invalid as indefinite.

---

[3] Use of "first structure" to refer to two different aspects of the respective inventions in the prior art also belies Checkpoint's assertion that one of ordinary skill in the art would understand the term.
[4] Checkpoint's proposed construction does not resolve the indefiniteness issue. One skilled in the art would not be able to understand the elements that constitute "a structure in which the internal spool is disposed."

### B.     '086 Patent Claim Terms

***First and Second Plurality of Ratchet Teeth Extending About a Common Axis;*** *Said First Member and the Spool Extending About a Common Axis*

Claim 1 of the '086 Patent discloses a security device comprising in part ". . . a ratchet mechanism connected to the spool including a movable member operatively connected to the spool and having a second plurality of ratchet teeth for releasable engagement with the first plurality of ratchet teeth to prevent the spool from rotating in the cable-loosening direction, said first and second plurality of ratchet teeth extending about a common axis . . . ."

Claim 9 of the '086 Patent discloses a security device comprising in part ". . . a ratchet mechanism connected to the spool, said ratchet mechanism having a handle mounted on the top wall portion of the housing for manual rotation of the top wall portion and spool without the need of a separate tool for tightening the cable around the object, said ratchet mechanism further including a movable first member having a first plurality of ratchet teeth for latching the spool in a fixed position relative to the housing to maintain the cable tightened around the object, with said first member and the spool extending about a common axis."

Throughout the majority of the briefing and at the *Markman* hearing, the parties discussed these two terms together, disagreeing only as to the construction of the word "extending" in each phrase. USS seeks to impose a construction deriving from the single disclosed embodiment, along with the prosecution history of the '086 patent; its parent patent, '899; and the related '966 patent. Those sources, according to USS, dictate

12

the construction "first and second plurality of ratchet teeth *extends radially inward or outward, respectively*, about a common axis" for the first term, and "said first member and the spool *extending radially outward* about a common axis" for the second. (Emphasis added.)

Checkpoint asserts that the claim language yields no indication that Checkpoint intended to limit the scope of the term to that included in the sole embodiment, and that USS's reference to the prosecution history of the parent patent is irrelevant to the construction of the claim. According to the claim language and prosecution history of the '086 patent, Checkpoint submits, the first disputed term should be constructed "first and second plurality of ratchet teeth *rotatable* about a common axis," and the second term "said first member and the spool *rotatable* about a common axis." (Emphasis added.)

As with the '966 patent, USS argues that the description of the '086 patent is a description of the invention that limits the claims, not a description of the preferred embodiment. Because the detailed description of the '086 patent is exactly the same as a portion of the detailed description of the '966 patent, however, the Court similarly concludes that, in general, the '086 patent specification describes the sole preferred embodiment of the invention, not the invention itself.

Likewise, USS asserts that the '086 patent's claims are limited by descriptions of the applicant's invention in its prosecution history. Here, USS draws from the prosecution history of the related '966 patent and the '899 patent, which is the parent patent of both the '086 patent and the '966 patent.

The law is clear that statements made during prosecution of a parent patent can affect the interpretation of claim terms in applications stemming therefrom. *See Allot, Inc. v. Int'l Trade Common*, 342 F.3d 1361, 1371–72 (Fed. Cir. 2003) (statements made during prosecution of parent patent surrendering subject matter binding on later interpretation of the claims); *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999) ("the prosecution history of a parent application may limit the scope of a later application using the same claim term"). Similarly, the prosecution history of a related patent is relevant to the claim construction of subsequent patents. *See Elkay Mfg. Co. v. Eco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999).

Here, again, USS fails to identify a reference in the specification that demonstrates "a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim*, 358 F.3d at 906 (quotation marks and citation omitted).

Yet, the prosecution history of the parent '899 patent bolsters this interpretation. In its lengthy description of the "invention," written in response to the examiner's rejection of proposed claims as patentable over prior art, the applicant explained that "[a]pplicant's invention includes . . . a gear disk having a plurality of outwardly extending locking pawls . . ." and "a plurality of inwardly extending one-way ratchet teeth . . . ." (Doc. No. 70–8 at 1681.) Moreover, the description from the Amendment to the '966 patent, discussed at length above, describes the invention as including "[a] plurality of locking teeth 352 arranged in an annular fashion [that] extend radially inwardly from annular wall 350 relative to axis C . . . ." (Doc. No. 70–6 at 1650.)

Because the prosecution history of the '899 patent and '966 patent are relevant to construction of the '086 patent, and because that relevant prosecution history includes clear and unmistakable descriptions of the applicant's invention, the Court finds that the relevant claim terms are limited thereby. Consequently, for the claim term "first and second plurality of ratchet teeth rotatable about a common axis," the Court adopts USS's construction of "first and second plurality of ratchet teeth extending radially inward or outward, respectively, about a common axis." Likewise, for "said first member and the spool extending about a common axis," the Court adopts USS's construction of "said first member and the spool extending radially outward about a common axis.

### *Camming Mechanism*

The '086 patent discloses a "camming mechanism" in claim 1 and its dependent claims. USS derives its proposed construction from the specification and dictionary definitions, concluding that "camming mechanism" should be construed as "a mechanism which transforms rotary motion into linear motion."

Identifying prior art, dictionary definitions, and a graphical representation from a website, Checkpoint contends that "camming mechanism" encompasses more than USS's proposed construction. Accordingly, Checkpoint offers the construction "a mechanical mechanism having a cam and a cam follower such that the cam slidably engages the cam follower during movement of the cam in a first direction to cause movement of the cam follower in a second different direction"

"Camming mechanism" is not defined in the specification, but the camming mechanism described transforms rotary motion into linear motion. ('086 patent Col. 5:50–67, 7:40–49, Figs. 14–15.) That description does not limit the construction of

15

the claim term, though, because it relates to a preferred embodiment, not the entire invention.

Both parties cite dictionary definitions in support of their proposed constructions. Checkpoint references *The Handbook of Mechanical Engineering Terms* (2d Ed. 2009), which defines a cam as a "reciprocating, oscillating or rotating body which imparts reciprocating or oscillating motion to a second body, called the follower with which it is in contact." (Doc. No. 68 at 1365.) USS notes *Merriam-Webster's Collegiate Dictionary* (10th Ed. 2001) entry for "cam: a rotating or sliding piece in a mechanical linkage used esp. in transforming rotary motion into linear motion or vice versa," (Doc. No. 70–10 at 1696.), and that of *Webster's New Compact Desk Dictionary and Style Guide* (2002), defining "cam" as "a wheel, projection on a wheel, etc. that gives irregular motion, as to a wheel or shaft, or receives such motion from it" (Doc No. 70–11 at 1701).

The Court is convinced that USS's proposed construction is too narrow. All of the definitions cited by both sides allow for a broader concept of "camming mechanism" than simply one that transforms rotary motion into linear motion. Moreover, Checkpoint identifies several patents that are prior art to the '086 patent that disclose a camming mechanism that transforms linear motion in one direction into linear motion in another direction. Clearly, a person of ordinary skill in the art would recognize a camming mechanism to include linear cams and would understand the words "cam" and "cam follower" as used in Checkpoint's proposed construction. For these reasons, the Court construes "camming mechanism" as "a mechanical mechanism having a cam and a cam follower such that the cam slidably engages the cam follower during movement of

16

the cam in a first direction to cause movement of the cam follower in a second, different direction."

### Ratchet Mechanism

All asserted claims of the '086 patent contain the phrase "ratchet mechanism." This is the first of two '086 claim terms that USS argues are indefinite because they are used inconsistently in the specification.

Checkpoint argues that there is not a direct contradiction between the claim language and the specification, and that the term "ratchet mechanism" has an ordinary meaning that can be understood by a person of ordinary skill in the art.

When the same word appears multiple times in the same claim, that word should be interpreted consistently. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998). A patent's written description, however, can set forth more than one definition of a claim term. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1310 (Fed. Cir. 1999). Nonetheless, one skilled in the art, reading the description, "must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000).

In asserting that "ratchet mechanism" is indefinite, USS relies extensively upon *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336 (Fed. Cir. 2002). In *Allen*, the claim language indicated that a gear box could be pivoted "*only* in a plane *perpendicular* to said biaxial plane," but the specification stated specifically that the gear box "*cannot* pivot in a plane *perpendicular* to the biaxial plane." *Id.* at 1349 (emphasis in original). Refusing to read the term "perpendicular" in the claim to mean "parallel," the court found the claims to be invalid, because the claims did not "'particularly point[] out

17

and distinctly claim[]' what the inventor regards as his invention." *Id.* (citing 35 U.S.C. § 112(2)).[5]

Additionally, USS cites to *Application of Cohn*, 438 F.2d 989, 1000–01 (C.C.P.A. 1971), where the specification defined an "opaque finish" as a finish "*not obtained when an alkali metal silicate is used as a sealant*," but the claims called for sealing a surface with an alkali silicate to obtain an "opaque appearance." *Id.* at 1000–01 (emphasis added). Because of this "inexplicable inconsistency" within the claims, the court rejected them as indefinite. *Id.* at 1001.

Claim 1 of the '086 patent describes "a ratchet mechanism connected to the spool including a moveable member operatively connected to the spool and having a second plurality of ratchet teeth for releasable engagement with the first plurality of ratchet teeth to prevent the spool from rotating in the cable-loosening direction . . . ." The structure referred to as the "housing" is defined distinctly from the "ratchet mechanism" in Claim 1. Several times in the specification, however, "ratchet mechanism" is described more broadly, to include the housing and the spool. ('086 patent Col. 4:50–5:16, Figs. 6–8, 14–15.)

Despite the fact that the '086 specification uses "ratchet mechanism" differently than in the claims, a person of ordinary skill in the art would have no trouble understanding the limitation described in the claim language. The claim language defines "ratchet mechanism" clearly and distinctly. There is no indication that the broader usage

---

[5] Since recodified as 35 U.S.C. § 112(b), the section provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor [...] regards as the invention."

of "ratchet mechanism" in the specification was an attempt to broaden the scope of the claim term. While it certainly would have been better practice to have used a different term in the specification, the language of the claims and the description are sufficient to put a reader on notice of the different uses of the term.

Because the meaning of the claim term is discernible, this Court finds that the claim language is not indefinite and does not require construction. *See Bancorp Servs.,* 359 F.3d at 1371 (quoting *Exxon*, 265 F.3d at 1375).

### *Locking Member*

Claims 2 and 3 of the '086 patent, both dependent on claim 1, disclose a "locking member." As with "ratchet mechanism," USS submits that "locking member" is used in the claims in a manner "entirely inconsistent" with the specification, and is therefore indefinite.

Also akin to its argument with respect to "ratchet mechanism," Checkpoint proposes that the ordinary meaning of the term should govern.

Claim 2 discloses, "[t]he security device defined in claim 1 including a locking member preventing the camming mechanism from moving the first and second plurality of ratchet teeth out of engagement when in a locked position." Claim 3 states, "[t]he security device defined in claim 1 including a key operatively engageable with the locking member enabling the camming mechanism to disengage the first and second plurality of ratchet teeth placing the spool in the cable-loosening direction." Thus, the "locking member" disclosed in the claims is part of the same element as the "ratchet mechanism." In a different fashion, the term "locking member" is used in the description

to refer to the element found on the opposite side of the box to be secured as the ratchet mechanism. (*See, e.g.*, '086 patent Col. 4:14–22.)

As with "ratchet mechanism," the claim language describing "locking member" provides sufficient detail for the meaning of the claim term to be discernible. The "locking member" referenced in the claim language and that mentioned in the description are clearly different structures in different parts of the invention, and a person of ordinary skill in the art would not confuse the two.[6] Thus, "locking member" does not require construction.

### *Key*

The term "key" is part of claim 3 of the '086 patent. Because "key" is used in the specification to refer to two separate elements of the claimed device, USS believes that "key" must be constructed as "a component integrated into the security device which is configured to fit in a recess in the base of the device and rotate therein."

Checkpoint accuses USS of attempting to read limitations from the single embodiment onto the entire invention and submits that the ordinary meaning of "key" is the proper construction.

Claim 3 recites, "[t]he security device defined in claim 1 including a key operatively engageable with the locking member enabling the camming mechanism to disengage the first and second plurality of ratchet teeth placing the spool in the cable-loosening direction."

---

[6] Additionally, although USS did not raise the issue, the Court notes that "locking member" is not a means-plus-function limitation for reasons essentially similar to those discussed in the construction of "unlocking mechanism" in the '966 patent above.

The claim language is clear that the key disclosed therein is the "unlocking key" that disengages the locking teeth and the ratchet teeth, "plac[ing] the spool in a free wheeling position," ('086 patent Col. 6:61–63), not the "magnetic key" that enables the fastener on the opposite side of the secured box to be disengaged from the base, (*Id.* Col. 32–40). It follows that the ordinary meaning of the claim term is sufficient.

### Top Wall Portion Rotatably Mounted on a Cylindrical Sidewall

A "top wall portion rotatably mounted on a cylindrical sidewall" is described in claim 6 of the '086 patent. Pointing to the specification's use of "mounted on," and contrasting alternative uses of "mounting" language such as "mounted within," USS argues that the phrase should be constructed thusly: "top wall portion rotatably attached to, and on top of, a cylindrical sidewall."

Disagreeing with USS's interpretation of language from the specification, Checkpoint submits that the ordinary meaning of the disputed term is the proper construction.

Checkpoint is correct that "mounted on" is not always used in the specification to mean "mounted on top of." (*See* '086 patent Col. 5:60–64; Fig. 12 (gear disc described as "mounted on" the flange is on the bottom of the flange)). For its part, USS has not offered evidence to suggest that a person of ordinary skill in the art would not understand this term. Consequently, the Court finds that the term does not require construction.

### *The Spool Includes the First Plurality of Ratchet Teeth Operatively Connected Thereto*

Claim 10 of the '086 patent indicates that "the spool includes the first plurality of ratchet teeth operatively connected thereto[.]" Construing only the phrase "operatively connected" from the disputed term, USS examines surrounding claim language and what it believes to be the plain meaning of the term, concluding that "operatively connected" should be given the construction "directly physically connected to achieve a mechanical effect."

Construing the entire disputed term, Checkpoint counters that the claim language and the specification should be construed as "the spool having the first plurality of ratchet teeth mounted thereto."

Checkpoint's proposed construction fails to give effect to the term "operatively." Construing "operatively connected" as "mounted" further strains credulity in light of Checkpoint's ample use of "mounted" throughout the claims of the '086 patent. (*See, e.g.*, *id.* Col. 8:49, 8:63, 10:2.) In fact, both "operatively connected" and "mounted" are used in the same claim to describe relationships between structures. (*Id.* Col. 8:46–53).

On the other hand, USS's proposed construction is also not without problems. During a telephone hearing, USS's counsel explained that the genesis of "directly physically connected" in its recommended construction is the fact that the specification shows a direct physical connection among the subject structures in describing the preferred embodiment. (Doc. No. 88 at 2049–50.) As the Court has

22

explained in the context of constructing other claim terms above, the language of the specification does not support the limiting of claim terms based on the description of the preferred embodiment.

Recognizing that "operatively" must be given effect and that a direct physical connection is an unwarranted limitation, the Court construes the subject claim term as "the spool includes the first plurality of ratchet teeth connected thereto to achieve a mechanical effect."

## C.     ‘495 and ‘310 Patent Claim Terms

### *Integrated Theft Deterrent Device*

Claims 1, 14, 15, 16, and 18 of the ‘495 patent, and claims 1 and 17 of the ‘310 patent disclose an "integrated theft deterrent device." Relying on claim language that it believes underscores a permanent connection between the lanyard, the pin, and the tag body, Checkpoint proposes the following construction: "a theft deterrent assembly in which the tag body, pin, and lanyard are incorporated permanently into a single unit."

Noting that this term appears in the preamble of the claims, USS argues that this language cannot serve to limit the invention. According to USS, this phrase is "simply a 'laudatory term' that only sets forth the purpose of the claimed invention and does not present a structural limitation as Checkpoint proposes." USS insists that the plain and ordinary meaning should be afforded this term.

"Generally, the preamble does not limit the claims." *Allen Eng'g Corp.*, ., 299 F.3d at 1346 (citing *DeGeorge v. Bernier*, 768 F.2d 1318, 1322 n.3 (Fed. Cir. 1985)). However, "a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim. Conversely, a preamble is not

23

limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quotation marks and citations omitted). However, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such *reliance indicates use of the preamble to define, in part, the claimed invention." Id*. (citation omitted) (emphasis added); *see also Bell Commc'n Research*, *Inc. v. Vitalink Commc'n Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) (a preamble may be limiting "when the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention") (citation omitted) (emphasis in original).

"Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996) (citations omitted); *see Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) ("review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim" is necessary to determine whether the patentees intended the preamble to limit the claims); *see also Bell Commc'n Research*, 55 F.3d at 620 ("a claim preamble has the import that the claim as a whole suggests for it").

The Court begins its analysis with a review of the claims. Claim 1 of the '495 patent provides for a "lanyard having a first end and a second end, with the first end inaccessibly coupled within an aperture of the tag body" and "a pin being permanently connected to the second end of said lanyard . . . ." Claim 14 recites a method for manufacturing a device, wherein "a first end of the lanyard is maintained by the tag body," and "said pin attached to the second end of the lanyard." Claim 15 refers to a "lanyard extending from within said tag body" and "a pin being permanently connected to the second end of said lanyard . . . ." Turning to the '310 patent, claim 1 recites "a lanyard extending from within said tag body" and "a pin being permanently connected to said lanyard . . . ." Claim 17 of the continuation patent recites "the lanyard having a first end and a second end, with the first end maintained within an aperture of the tag body" and "a pin being permanently connected to the second end of said lanyard . . . ."[7]

Checkpoint maintains that this claim language demonstrates that the invention is limited to a device wherein a permanent connection exists between the pin and the lanyard, and the lanyard and tag body. USS does not take issue with Checkpoint's suggestion that the claims language, such as "permanently connected to," teaches a permanent connection between the lanyard and the pin. In fact, USS argues that the fact that this language was used to describe the connection between the lanyard and the pin, and different language was used to describe the connection between the lanyard and the tag body, militates against a finding that the two connections should be treated the same.

---

[7] The independent claims found in both patents also require a first end of the lanyard which is either "inaccessibly coupled within," "maintained by" "within," or "extending from within" the tag body. Additionally, the dependent claims speak to a pin that is "attached" or "permanently connected" to the second end of the lanyard.

According to USS, if the patentee "intended the claims to require a permanent connection between the lanyard and the tag body . . . it would certainly have used the same 'permanently' language at that point in the claims as well." (Doc. No. 74 at 1800.) The Court agrees. Having opted for different language, it is reasonable to assume that the patentee intended a different meaning. *See Chicago Bd. Options Exch. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (recognizing "the general presumption that different terms have different meanings") (citation omitted).

Nonetheless, the claim language emphasizes the importance of the connection between the lanyard and the tag body. While the connection may be something short of permanent, the language selected by the patentee—including "inaccessibly coupled within" and "maintained by"—suggests an immovable or secure quality to the connection.[8] Such a conclusion is consistent with, and reinforced by, each patent's specification. In distinguishing the prior art, the specification explains that "[t]he prior art does not address the need for an integrated EAS tag that is difficult to defeat and easy to use. In addition, the prior art fails to provide a theft deterrent tag assembly that incorporates the pin, a lanyard and the tag body into one unit." ('495 patent Col. 2:29-33; '310 patent Col. 2:34-37.) "Therefore, it is a primary objective of the invention to provide

_____

[8] USS conceded as much at the *Markman* hearing. While resisting Checkpoint's position that the connection between the lanyard and the tag body is permanent, counsel for USS likened the connection to the relationship between a car and its tires. "[T]he tires on your car are integrated into your car, but they're not permanently attached to your car, thankfully. If you get a flat, you could take them off. They are not easy to get off. They are maintained by your wheel well. They're integrated into your car, but they're not permanently attached." (Doc. No. 90, Hearing Transcript, at 2180); (*see also id*. at 2202 ["My car has wheels. They are integrated into my car, but they're not permanent. There's a difference between 'integrated' and 'permanent.'"].)

an EAS tag wherein the tag body and pin are an integrated unit."[9] ('495 patent Col. 2:44-46; '310 patent Col. 2:48-50.)

Emphasizing the time and labor savings realized by the new invention, the specification also provides:

> In keeping with the principles of the present invention, a unique EAS theft deterrent tag is disclosed wherein the pin element is integrated into the tag body via an elongated element. In integrating the pin component with the tag body, labor time and costs are reduced when removing the tag from an article being protected thereby because separate bins are not required for storing the tag body and the pin component until they are reused. In addition, labor time and costs during attachment of the tag body to an article are also reduced because the pin component is integrated therewith and a separate search for a corresponding pin is eliminated. ('495 patent Col. 2:65-67, Col. 3:1-7; '310 patent Col. 3:1-11.)

The unmistakable message of the specification is that, unlike the prior art, the three pieces of USS's device are connected in such a way that they are unlikely to come apart inadvertently, and may be stored together.

However, the fully integrated nature of the anti-theft device is most clearly seen in the prosecution history of the '495 patent. In responses to the examiner's rejection of the claims as unpatentable, the applicant participated in a telephonic interview with the examiner, during which the applicant emphasized the security of the connection between the lanyard and the tag body. The applicant stated that, "Fujiuchi fails to at the very least . . . teach the limitation of Applicant's claim 1 wherein the lanyard has one end permanently fixed within the tag body." (Doc. No. 68, Ex. 20, Applicant Interview

---

[9] Checkpoint also cites the portion of the specification that teaches that "[i]t is a further objective of the invention to provide an EAS tag that provides an integrated pin to reduce the chances of injury to persons stepping on the pin, as is commonly a problem with the pins utilized in the prior art." ('495 patent Col. 2:54-57; '310 patent Col. 2:58-61.) While this language supports Checkpoint's position that the pin is permanently attached to the lanyard—a fact which USS does not appear to contest—it does not speak to the connection between the lanyard and the tag body.

Summary, at 1393.) The examiner's recollection of the interview was similar: "The Applicant has contended that the lanyard of the present invention is made permanently attached to the tag body while the lanyard of the reference is removable. The Applicant believes that this feature should be considered inventiv (sic)." (Doc. No. 68, Ex. 19, Examiner Interview Summary, September 9, 2006, at 1391.)

Even earlier in the prosecution history, the applicant emphasized the importance of the connection between the lanyard and the tag body. In the August 8, 2006 Amendment of the '495 patent, the applicant argued:

> Regarding Claim 1, Fujiuchi fails to teach Applicant's limitation of "a lanyard 38 extending from within said tag body 20." Fujiuchi teaches away from Applicant's claimed invention in that the lanyard does not extend from within the tag body, but is instead fully detachable from the tag body as illustrated in Figure 3, reference numerals 30 and 30a. Fujiuchi's lanyard is susceptible to being lost, whereas one end of Applicant's lanyard is maintained within the tab body and cannot fully detach from the body.

(Doc. No. 68, Ex. 22, August 8, 2006 Amendment, at 1419.) In addition, the applicant argued: "Furthermore, one end of Applicant's device is always maintained within the tag body." (*Id*. at 1420.) The applicant went on to note that, "Fujiuchi fails to teach or render obvious Applicant's anchor which maintains one end of the lanyard within the tag body in an irremovable manner." (*Id*. at 1421-22.)

It is clear from the specification and the prosecution history that USS relied substantially on the benefit of a fully integrated unit as "patentably significant." *Cf. Catalina Marketing Int'l*, 289 F.3d at 809 (collecting cases where preamble language merely extolled the virtues of the claimed invention). The specification and the prosecution history also demonstrate that USS "clearly and unmistakenly" relied on this

28

benefit to distinguish the prior art. *See id.* at 808-09. It is equally apparent that the claim drafter chose to use "*both* the preamble and the body" of the claims to define the connection between the lanyard and the tag body. *See Bell Commc'n Research*, 55 F.3d at 620 (emphasis in original).

USS also argues, however, that to ascribe any type of permanence to this connection would be in contravention of the embodiment shown in Figure 7 of the common specification. According to USS,

> That embodiment clearly discloses a pin which is separate from the lanyard, extending through a hole in the lanyard to lock in the tag body. While USS does not contend that this embodiment is incorporated into any of the asserted claims, which all require a permanent connection between the ***lanyard and pin***, it does demonstrate that USS did not consider its invention to be limited to a device in which the tag body, lanyard, and pin are all permanently connected to each other. Checkpoint's proposed construction is, thus, directly at odds with the specification, and such an interpretation that excludes a preferred embodiment "is rarely, if ever, correct."

(Doc. No. 74 at 1800-01, emphasis in original, citation omitted.)

It is well settled that an interpretation of a claim term that would exclude a preferred embodiment of the invention "'is rarely, if ever correct and would require highly persuasive evidentiary support.'" *Nat'l Steel Car, Ltd. v. Canadian Pac. R.R., Ltd.*, 357 F.3d 1319, 1337 n.19 (Fed. Cir. 2004) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)); *see Rheox, Inc.* v. *Entact, Inc.*, 276 F.3d 1319, 1327 (Fed. Cir. 2002) (same). "But where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecutorial disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003); *see N. Am.*

*Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005) ("[W]e have previously explained that limitations may be construed to exclude a preferred embodiment if the prosecution history compels such a result.") (citation omitted). "For prosecution disclaimer to arise, 'the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable.'" *Revolution Eyewear v. Aspex Eyewear, Inc.*, 175 F. App'x 350, 355 (Fed. Cir. 2006) (quoting *Omega Eng'g, Inc.*, 334 F.3d at 1326).

In *N. Am. Container*, the Federal Circuit applied the doctrine of prosecution disclaimer to the patenee's blow-molded plastic bottles. Notwithstanding the fact that two of the figures incorporated within the specification showed concave inner walls—a preferred embodiment, the court found that "the applicant, through argument during the prosecution, disclaimed inner walls of the base portion having any concavity." 415 F.3d at 1345. Similarly, in *Revolution Eyewear*, the court found that the patentee had surrendered a preferred embodiment where it had repeatedly distinguished the prior art in such a way that some of the preferred embodiments were read out of the claim. 175 F. App'x at 356.

As set forth above, the applicant here, like the patentees in *N. Am. Container* and *Revolution Eyewear*, has clearly and unmistakably surrendered a preferred embodiment to overcome an obviousness rejection. Throughout the prosecution, USS repeatedly distinguished the prior art on the ground that the innovation of its invention was that the lanyard was always maintained within the tag body. Having disavowed the

embodiment to obtain the patent, USS may not use claim construction to recapture it.[10]

*See L & P Prop. v. JTM, LLC*, 578 F. Supp. 2d 318, 325 (D. Mass. 2008) ("The doctrine of prosecution disclaimer is intended to preclude patentees from seeking to recapture through claim construction meanings disclaimed during prosecution to overcome prior art rejections.") (citations omitted).

   Thus, viewing the totality of the claims, including the preamble, the claim language, the specification, and the prosecution history, the Court concludes that the preamble term "integrated" was meant to serve as a limitation on the claims. The Court further finds that USS disclaimed the embodiment identified in Figure 7 during the prosecution of the patent, and limited the scope of the claims accordingly. Thus, the Court construes the phrase "integrated theft deterrent device" to mean "a theft deterrent assembly wherein the pin is permanently connected to the lanyard, and the lanyard is securely anchored to the tag body to avoid detachment."

   *Extending from within Said Tag Body; Maintained by the Tag Body; Anchor is Securely Maintained within Tag Body; and Maintained within an Aperture of the Tag Body*

   Checkpoint's position that the integrated theft deterrent device contains a permanent connection between the lanyard and tag body flows into its proposed definition of the terms "extending within said tag body," "maintained by the tag body," "anchor is securely maintained within tag body," and "maintained within an aperture of

---

[10] Moreover, though specifically raised by the Court at the *Markman* hearing, USS did not reference Figure 7 in support of its construction of the term "integrated theft deterrent device," or at any time during the hearing. (Hearing Transcript at 2198.)

the tag body." Relying on the same arguments advanced for its proposed definition of "integrated theft deterrent device," Checkpoint proposes the following definitions: "*extending from within said tag body*" means "permanently connected to the tag body;" "*maintained by the tag body*" means "permanently connected to the tag body;" "*anchor is securely maintained within tag body*" means "anchor is permanently held in the interior cavity of the tag body;" and "*maintained within an aperture of the tag body*" means "permanently held in an aperture of the tag body." USS insists that no construction is necessary for any of these disputed terms.

The Court observes that its analysis rejecting Checkpoint's position that the integrated theft deterrent device contains a permanent connection between the lanyard and the tag body applies equally to its consideration of these terms, all of which address (either directly or tangentially) this same connection. As stated above, terms "maintained by," maintained within," and "securely maintained within"—while they do suggest an immovable connection—do not equate with "permanence." The Court, therefore, rejects Checkpoint's suggestion that these terms teach a permanent connection between the lanyard and the tag body.[11] Moreover, given the Court's determination that the term "integrated theft deterrent device" includes the limitation that the connection between the

---

[11]In addition, the language chosen for a dependent claim in the '495 patent also counsels against equating all of these terms with "permanent." Claim 16 provides for an integrated theft deterrent device wherein the lanyard has a first end and a second end, with the first end *permanently and irremovably coupled within* aperture of the tag body by an anchor attached to the first end." ('495 patent Col. 7:1-6, emphasis added.) If the different language selected in these four disputed terms all mean "permanent," then the clear use of that term in dependent Claim 16 is rendered meaningless. *See Acumed LLC v. Stryker Corp*., 483 F.3d 800, 806 (Fed. Cir. 2007) (Under the doctrine of claim differentiation, "'[t]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.'") (quoting *Libel-Florsheim Co. v. Medran, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)).

lanyard and the tag body is secured in such a way to avoid detachment, the Court finds that no further construction of these four disputed claims is necessary.

### Extending Inwardly

The term "extending inwardly" appears in claims 1, 14, and 15 of the '495 patent, and claims 1 and 17 of the '310 patent. Checkpoint argues that the intrinsic evidence, taken as a whole, provides that the extension refers to the side walls as they extend inward. Checkpoint, therefore, suggests that "extending inwardly" should be interpreted to mean "extending into the interior cavity of the tag body." USS posits that the term refers to the extension of each half of the tag body toward the other half, and proposes that the term be understood to mean "extending toward the perimeter junction of the first and second halves."

Claims 1 and 15 of the '495 patent disclose a device comprising in part "a first half and a second half that are joined around a perimeter of said tag body by a first side wall and a second side wall extending inwardly from said first and second halves respectively . . . ." Claim 14 discloses a method of manufacturing a device "providing a first half and a second half that are joined around a perimeter of said tag body by a first side wall and second side wall extending inwardly from said first and second halves respectively . . . ." Claims 1 and 17 of the '310 patent disclose a "first half and a second half that are joined around a perimeter of said tag body by a first side wall and second side wall extending inwardly from said first and second halves respectively . . . ."

In support of its position that the side walls extend inwardly into the tag body, Checkpoint argues that it is clear from the specification and prosecution history that any reference to "in" (therein, within, inwardly) in the claims, refers to the interior

33

cavity of the tag body. For example, Checkpoint cites to the language relating to the anchor, which is described as "securely maintained within tag 20."[12] ('495/'310 patents Col. 4:36-37.)  However, none of these terms are used in connection with the side walls extending from the first and second half and, therefore, provide little insight into the extension of the side walls.

Checkpoint also points to the prosecution history, highlighting the addition of claim 9 as indicating that the inwardly extending side walls were known in the prior art, and citing its own patent No. D427,929. Checkpoint notes that the '929 patent, which issued four years before the '495 patent application was filed, "demonstrates a security device with two halves 'extending toward the perimeter junction of the first and second halves' as shown below . . . ." (Doc. No. 69 at 1500-01). However, the language Checkpoint quoted does not appear in the exhibit cited by Checkpoint and further, the '929 patent actually discloses a very different design in which a pin is inserted into a tag body without the use of a lanyard. As such, Checkpoint's misleading reference to its earlier patent fails to support its argument that the only possible distinction between the reference and the cited claim is the difference in the side walls. Further, there is no evidence that the '929 patent was referenced in the prosecution history of USS's patents.

In contrast, USS argues that the disputed term refers to the extension of each half of the tag body toward the other half. The claim language and the specification support USS's construction. It is clear from the claim language that it is the side walls

---

[12] Checkpoint also notes that the term "extends inwardly" is used to describe the reinforcement wall 46: "a reinforcement wall 46 . . . extends inwardly from top half 22 and further defines aperture 36." ('495/'310 patents Col. 4:37-39.)]

that extend inwardly, from their respective halves, toward where they are "joined by a perimeter" of the tag body. The figures included in the specification of the '495 patent reinforce this conclusion. For example, in Figure 3, it is apparent that the side walls (26 and 28) extend inwardly from the first and second halves to where they are joined around a perimeter of the tag body. Neither the language of the claims or specification, nor the figures incorporated into the specification, support a finding that the side walls extend inward toward the interior of the tag body cavity.[13] Accordingly, the Court adopts USS's construction, and finds that the term "extending inwardly" means "extending toward the perimeter junction of the first and second halves."

### Apex

As is the case with many of the disputed terms and phrases, the parties disagree in the first instance as to whether construction is necessary. USS maintains that no construction is necessary, as the term "apex" is easily understood in the context of the claims. Moreover, because the claims require an "apex region," USS suggests that Checkpoint's construction of only the term "apex" is confusing and is inconsistent with the claims. Checkpoint responds that defining the term "apex" is crucial to an understanding of the larger term "apex region," as that term is used in the claims.

---

[13] USS correctly observes that Checkpoint's interpretation of "extend inwardly" would render the patent's use of the term "side wall" nonsensical, as they would neither form the side of the tag body nor serve as walls. *See generally Phillips*, 415 F.3d at 1312-17 (absent evidence that the inventor chose to act as his own lexicographer, words of a claim are to be given their ordinary and customary meaning); *see TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1372 (Fed. Cir. 2008) (rejecting proffered alternative definition of a commonly understood term as leading to a "nonsensical result").

Checkpoint urges the Court to construe the term "apex" to mean "the singular point positioned furthest away from the tag body."

The claims clearly disclose the existence of an "apex region." Claims 1 and 15 of the '495 patent disclose "an apex region extending from said tag body such that the apex region causes the tag body to a side . . . ." Claim 14 of the '495 patent teaches a method of manufacturing a device containing "an apex region on tag body such that said pin is maintained in horizontal alignment with a flat surface . . . ." Claim 17 of the '310 patent provides for "an apex region extending from said tag body such that the apex region causes the tag body to a side . . . ."

USS argues that the requirement of an apex region is at odds with Checkpoint's construction, which limits the "apex" to a singular point. USS insists that a "singular point" cannot cover a region. The Court finds this argument persuasive, and concludes that no construction is necessary. In so ruling, the Court observes that Checkpoint's reliance on the prosecution history, which also discusses the existence of an "apex region," does not alter the fact that only a region can extend from an area, as is contemplated by the claims.

### Horizontal Alignment

The phrase "horizontal alignment" appears in claims 1, 14, and 15 of the '495 patent, and claim 17 of the '310 patent. Claims 1 and 15 of the '495 patent, and Claim 17 of the '310 patent, provide that, "the apex region causes the tag body to a side such that the pin is maintained in horizontal alignment with a flat surface to prevent injury from stepping thereon." Similarly, claim 14 teaches a method of manufacturing a theft deterrent device wherein "said pin is maintained in horizontal alignment with a flat

36

surface on which the tag body rests . . . ."  Checkpoint proposes the usage of the ordinary and customary meaning of "horizontal" and "alignment," which it suggests would mean "parallel with the surface upon which the tag body is resting."

Interestingly, USS also suggests that no construction is necessary, as it, too, believes that these terms are readily understood by someone of skill in the industry. It argues that Checkpoint's proposed "parallel" definition of horizontal alignment would go beyond the scope of the claims, and would require "essentially perfection in spatial orientation." While it does not offer an alternative plain and ordinary meaning for the term "horizontal," it argues that—in the context of the claims—the larger "horizontal alignment" term should be understood to cover a pin "which prevents injury by placing the pin in a horizontal alignment, so that it cannot penetrate a foot if stepped on."

The ordinary and customary meaning of a disputed claim is presumed to be correct unless a different meaning is clearly set forth in the intrinsic materials. *K-2 Corp v. Salomon S.A.*, 191 F.3d 1356, 1362-63 (Fed. Cir. 1999). Dictionary definitions can provide evidence of a claim term's ordinary meaning. *Abbot Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1350 (Fed. Cir. 2003).

In *Whirlpool Corp. v. LG Elec., Inc.*, 423 F. Supp. 2d 730 (W.D. Mich. 2004), the court was called upon to interpret the phrase "horizontal axis," which related to the position of the wash chamber in washing machines. While both parties agreed that the plain and ordinary meaning of the term should apply, they disagreed as to what that meaning was. As the patent holder, Whirlpool advocated for a definition that allowed for a predominately or substantially horizontal axis, and offered dictionary definitions in support. *Id.* at 738 (plaintiff relying on Webster's Third New International Dictionary

37

[horizontal can mean "of, relating to, or situated near the horizon", or "placed or operating chiefly along a plane parallel to the horizon"]). In contrast, LG relied on more restrictive definitions that would require strict or absolute horizontal alignment. *Id.* (defendant relying on The American Heritage Dictionary of the English Language [horizontal means "in the plane of the horizon" or "at right angles to a vertical line"]); *see also Tritex Tech., Inc. v. United States*, No. 02-255 C, 2004 WL 1299571 (Ct. Fl. Claims June 4, 2004) (acknowledging restrictive definitions for horizontal ["parallel to the plane of the horizon"] as well as more general definitions ["placed operating chiefly along a plane parallel to the horizon."]). Turning to the claim language, the court adopted Whirlpool's more expansive definition, finding that the disputed term related to the tumbling of the clothes in the chamber, which could be accomplished whether the axis was perfectly horizontal or somewhat inclined. *Whirlpool*, 423 F. Supp. 2d at 738-40.

A similar conclusion is warranted here. It is clear from the claim language in USS's patents that the key feature of the pin's alignment relative to the floor is that, if the device is dropped, it will fall in such a way that the pin will roll to the side so that the sharp end of the pin does not lie face up. Claim 1 of the '495 patent and Claim 17 of the '310 patent specifically teach that the pin will roll to one side "such that the pin is maintained in horizontal alignment with a flat surface to prevent injury from stepping thereon[.]" ('495 patent Col. 5:41-44; '310 patent Col. 6:43-46.) Thus, the claim language specifically emphases that the master stroke of this improvement over the prior

art is that it will prevent the pin from causing injury, which will happen whether the pin lies perfectly parallel or is predominately parallel to the horizon.[14]

The specification of the '495 and '310 patents also describe how "the risk of work place injury is reduced because when the tag body falls on the floor, the pin also lays flat on the floor and should not penetrate the foot of an employee stepping thereon." ('495 patent Col. 3:9-12; '310 patent Col. 3:12-15.) Not only do the specifications emphasize the purpose of the pin's alignment, the fact that USS chose to use the descriptive term "flat," instead of the more exacting term "parallel," further reinforces the understanding that the disputed term was not to meant to be limited to a pin that rests at an absolutely parallel orientation to the surface upon which it may fall. The Court, therefore, applies the plain and ordinary meaning to the term "horizontal alignment," and concludes that the term refers to a pin which "prevents injury by placing the pin in a horizontal alignment, so it cannot penetrate a foot if stepped on."

**IT IS SO ORDERED**.

Dated: October 1, 2014

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[14]In *Whirlpool*, the claim language also used terms as "predominately" and "generally," in connection with horizontal axis of the washing chamber. While USS's patents do not make use of such adjectives, the specific language in the claims underscoring the benefits of the improvement makes clear that the avoidance of injury, and not perfect spatial alignment, is the cornerstone of the patents.

39